**Wendell NOE, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–755.**

Court of Appeals of Arkansas.

March 2, 2011.

---

ter unless evidence is introduced sufficient to support a finding that he has personal knowl-

edge of the matter.")

*See also* 456 F.3d 868.

 

 

Melissa Bristow Richardson and Kelley Webb, Jonesboro, for appellant.

Dustin McDaniel, Atty. Gen., Rachel M. Hurst, Asst. Atty. Gen., Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

Wendell Noe was convicted by the St. Francis County Circuit Court of violating Arkansas Game and Fish Commission (AGFC) Codes 11.03, 15.05, and 15.12 and fined $2500. On appeal, Noe argues that his convictions must be reversed because the AGFC Codes are preempted by and in conflict with four migratory-bird treaties entered into by the United States of America and that his actions were in full compliance with federal law. We disagree and affirm the convictions.

In 1984, Noe opened Ducks & Ducks, Inc., which raised and sold mallard ducks. Noe sold these captive-reared mallard ducks to hunting clubs, game preserves, retriever trials, and kennel clubs throughout the United States and Canada. On July 9, 2007, Noe was cited by AGFC Wildlife Officers with violations of AGFC Codes 11.03 (prohibiting the aiding, accompanying, or abetting of another in the illegal taking, attempting to take, possessing, buying, or selling of protected wildlife), 15.05 (prohibiting the release into the wild any native or non-native species of wildlife without prior approval of the AGFC), and 15.12 (requiring a Wildlife Breeder/Dealer Permit for those persons who rear, breed, propagate, produce, or distribute any game birds).[1]

On October 15, 2007, the St. Francis County District Court found Noe guilty of violating Codes 11.03, 15.12, and 15.05 (which was merged into the violation of Code 15.12) and fined him $3000. Noe appealed his convictions to the St. Francis County Circuit Court. At trial, Noe admitted that he did not possess a valid Wildlife Breeder/Dealer Permit from the AGFC and that he released and/or sold captive-reared mallard ducks to both residents and non-residents of Arkansas throughout 2007. However, he argued that four treaties the United States entered into with Great Britain, Japan, Mexico, and Russia for the protection of migratory birds were federal law that preempted and conflicted with the AGFC Codes; therefore, he did not have to comply with them.

The trial court disagreed, and on March 9, 2010, it convicted Noe of violating Codes 11.03, 15.05, and 15.12, fining him $2500. In finding him guilty, the trial court stated that the migratory-bird treaties did not preempt the applicable AGFC Codes. Noe filed a timely appeal of these convictions.

The issue of preemption is a question of law, and we review questions of law de novo on appeal. *Selmon v. Metro-*

1. AGFC Codes 15.05 and 15.12 were repealed in September 2007.

*politan Life Ins. Co.*, 372 Ark. 420, 424, 277 S.W.3d 196, 200 (2008). Likewise, the standard of review with respect to statutory and constitutional interpretation is de novo. *Fitton v. Bank of Little Rock*, 2010 Ark. 280, 365 S.W.3d 888. "On appeal, our task is to read the laws as they are written, and interpret them in accordance with established principles of statutory and constitutional construction.... The fundamental rule is that the words of the constitution or statute should ordinarily be given their obvious and natural meaning." *Fitton*, 2010 Ark. 280, at 4, 365 S.W.3d at 891. Furthermore, we are not bound by the decision of the trial court; however, in the absence of a showing that the trial court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. *Id.*, 365 S.W.3d at 891.

In August 1916, the United States and Great Britain entered into a migratory-bird treaty. Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702 (U.S.-Great Britain Convention). The United States subsequently entered into three similar treaties with Mexico,[2] Japan,[3] and Russia.[4] These treaties generally prohibit the taking, sale, and transportation of migratory birds, their nests, and eggs.[5]

In 1918, Congress enacted the Migratory Bird Treaty Act (MBTA), codified at 16 U.S.C. §§ 703–712, to give effect to the terms of the U.S.-Great Britain Convention.[6] Currently, the MBTA authorizes the Secretary of the Interior to adopt regulations governing and permitting the hunting, possession, sale, and transportation of migratory birds consistent with all four migratory-bird treaties. *Noe v. Henderson*, 373 F.Supp.2d 939, 943 (E.D.Ark.2005) (citing 16 U.S.C. § 703(a)). Nothing in the MBTA expressly prohibits state regulation of migratory birds. *Noe*, 373 F.Supp.2d at 943. To the contrary, the MBTA expressly permits state regulation:

**2.** Convention for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7, 1936, 50 Stat. 1311 (U.S.-Mexico Convention).

**3.** Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3329 (U.S.-Japan Convention).

**4.** Convention for the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4647 (U.S.-Russia Convention).

**5.** Article V of the treaty between United States and Great Britain states: "The taking of nests or eggs of migratory game or insectivorous or nongame birds shall be prohibited, ..." U.S.-Great Britain Convention, art. 5. The treaty between the United States and Mexico provides: "The high contracting parties agree to establish laws, regulations and provisions ... including the establishment of close seasons, which will prohibit in certain periods of the year the taking of migratory birds, their nests or eggs, as well as their transportation or sale, alive or dead, their products or parts, ..." U.S.-Mexico Convention, art. 2. Article III of the U.S.-Japan Convention provides: "The taking of migratory birds or their eggs shall be prohibited. Any sales, purchase or exchange of these birds or their eggs, taken illegally, alive or dead, and any sale, purchase or exchange of the products thereof or their parts shall also be prohibited." U.S.-Japan Convention, art. 3. Finally, the treaty between the United States and Russia states: "Each Contracting Party shall prohibit the taking of migratory birds, the collection of their nests and eggs and the disturbance of nesting colonies. Also, the sale, purchase or exchange of these birds, whether dead or alive, or their nests or eggs, and any sale, purchase or exchange of their products or parts thereof or their parts shall be prohibited...." U.S.-Russia Convention, art. 2.

**6.** The constitutionality of the U.S.-Great Britain Convention and the MBTA was tested and upheld in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

Nothing in this subchapter shall be construed to prevent the several States and Territories from making or enforcing laws or regulations not inconsistent with the provisions of said conventions or of this subchapter, or from making or enforcing laws or regulations which shall give further protection to migratory birds, their nests, and eggs....

*Noe,* 373 F.Supp.2d at 943 (citing 16 U.S.C. § 708).

In December 2004, Noe and two of his customers filed a federal declaratory-judgment action, alleging that certain AGFC Codes were preempted by the MBTA and 50 C.F.R. § 21.13.[7] *Noe,* 373 F.Supp.2d at 942. The district court granted summary judgment to the AGFC, holding that nothing in the MBTA or § 21.13 prohibited a state from regulating the raising, use, or transportation of captive-reared mallard ducks, and nothing in the AGFC Codes at issue conflicted with the MBTA. *Id.* at 944–45. Noe appealed the district court's order of summary judgment to the United States Court of Appeals for the Eighth Circuit. In an opinion handed down on August 7, 2006, the Eighth Circuit affirmed the order of the district court. *Noe v. Henderson,* 456 F.3d 868 (8th Cir.2006).

In his appeal from the St. Francis County Circuit Court, Noe does not argue (as he did in federal court) that the MBTA, federal statutes, and federal regulations preempt the AGFC Codes. Rather, he argues that the treaties with Great Britain, Mexico, Japan, and Russia preempt the AGFC Codes because each treaty contains an exception specifically authorizing the taking, possessing, and buying or selling of migratory birds for propagating purposes.[8] He also argues that the AGFC Codes con-

flict with the treaties because the treaties do not require citizens of the United States to obtain a permit to propagate, breed, produce, rear, distribute, or release mallard ducks in the United States.

Since *McCulloch v. Maryland,* 4 Wheat. 316, 407, 4 L.Ed. 579 (1819), it has been accepted that Congress has the constitutional authority to preempt state law. *Goforth v. Smith,* 338 Ark. 65, 71, 991 S.W.2d 579, 582 (1999). On this issue, the United States Constitution reads as follows:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

*Goforth,* 338 Ark. at 71, 991 S.W.2d at 583 (citing U.S. Const. art. 6, cl. 2).

A state-law claim is preempted by a federal law when (1) congressional enactments explicitly preempt state law; (2) state law regulates conduct in a field that Congress intended the federal government to occupy exclusively; (3) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress; and (4) compliance with both state and federal law is impossible. *Goforth,* 338 Ark. at 71, 991 S.W.2d at 583. In any preemption analysis, the overriding principle that must guide our review is whether Congress intended to preempt state law. *Emerald Dev. Co. v. McNeill,* 82 Ark. App. 193, 197,

---

7. This federal regulation lists the exceptions to requiring a permit for the acquisition, possession, sale, trade, donation, transportation, and disposal of captive-reared mallard ducks.

8. U.S.-Great Britain Convention, art. 5; U.S.-Mexico Convention, art. 2; U.S.-Japan Convention, art. 3; U.S.-Russia Convention, art. 2.

120 S.W.3d 605, 608 (2003). However, the historic police powers of the states are not to be superseded by a federal act unless that is the clear and manifest purpose of Congress. *Emerald Dev. Co.*, 82 Ark. App. at 197, 120 S.W.3d at 608. The burden is on the moving party to prove that Congress intended to preempt state law. *Id.*, 120 S.W.3d at 608.

 We hold that the trial court did not err in finding that Noe failed to satisfy his burden of proving preemption in this case. First, the language of the treaties does not explicitly preempt state law regulating migratory birds and does not purport to exclusively occupy the field of migratory-bird regulation for propagating purposes or for private game farms. In fact, the language of the treaties expressly provides that the exceptions are to be regulated by other authorities.[9] Based upon the language of the treaties, we reject Noe's argument that the treaties preempt the AGFC Codes and affirm the trial court on this point.

We likewise hold that the trial court did not err in finding that the AGFC Codes do not conflict with the treaties. We agree that there is no express requirement in the federal treaties that Noe have a permit to sell ducks. Therefore, his failure to obtain an AGFC permit is not a violation of federal law. However, because the treaties do not preempt the AGFC Codes, Noe is required to comply with state law as long as it does not conflict with federal law.

The AGFC Codes, consistent with the language of the treaties, allow the rearing, breeding, propagating, producing, distributing, and selling of ducks with proper approval of the AGFC. Ark. Game & Fish Comm'n Code §§ 11.03, 15.05, 15.12. These state regulations are consistent with the treaties in that they provide additional protection for migratory birds, which in no way conflicts with the purpose or intent of the treaties. Because state regulations are more restrictive than the treaties, com-

---

9. For example, the treaty between the United States and Great Britain states: "The taking of nests or eggs of migratory game or insectivorous or nongame birds shall be prohibited, except for scientific or propagating purposes *under such laws or regulations as the High Contracting Powers may severally deem appropriate.*" U.S.-Great Britain Convention, art. 5 (emphasis added). This treaty further provides: "The High Contracting Powers agree themselves to take, or propose to their respective appropriate law-making bodies, the necessary measures for insuring the execution of the present Convention." U.S.-Great Britain Convention, art. 8.

The U.S.-Mexico Convention states that, during certain periods of the year, the taking, transportation, and selling of migratory birds shall be prohibited "except when proceeding, *with appropriate authorization,* from private game farms or when used for scientific purposes, for propagation or for museums." U.S.-Mexico Convention, art. 2 (emphasis added). Under this same article, it states, "The high contracting parties agree to estab-

lish laws, regulations and provisions to satisfy the need ... [to protect migratory birds]." *Id.*

The treaty between the United States and Japan states, "Exceptions to the prohibition of taking [of migratory birds] may be permitted *in accordance with the laws and regulations of the respective Contracting Parties.*" U.S.-Japan Convention, art. 3 (emphasis added). This treaty further states, "The Contracting Party agrees to take measures necessary to carry out the purposes of this Convention." U.S.-Japan Convention, art. 7.

And finally, the U.S.-Russia Convention states, "Exception to these prohibitions *may be made on the basis of laws, decrees or regulations of the respective Contracting Parties ...* [f]or scientific, education, propagative, or other specific purposes...." U.S.-Russia Convention, art. 2 (emphasis added). This treaty goes on to state, "This Convention shall in no way affect the right of the Contracting Parties to adopt stricter domestic measures which are deemed to be necessary to conserve migratory birds and their environment." U.S.-Russia Convention, art. 9.

pliance with both federal and state law is possible. Therefore, as a matter of law, the AGFC Codes do not conflict with the migratory-bird treaties.

In sum, we hold that the trial court did not err in finding that the AGFC Codes were not preempted by and not in conflict with the migratory-bird treaties that the United States entered into with Great Britain, Mexico, Japan, and Russia. As such, we affirm Noe's convictions.

Affirmed.

GLADWIN and MARTIN, JJ., agree.